USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/8/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

ODYSSEY MARINE EXPLORATION, INC.,

                          Plaintiff,

              -v-

THE SHIPWRECKED AND ABANDONED SS
MANTOLA, its cargo, apparel, tackle, and
appurtenances, etc., located within a five nautical mile
radius of the coordinates 49° 50' 16.391" N, 13° 06'
11.767" W, *in rem*,

                          Defendant.

--------------------------------------------------------------------- X

17 Civ. 2924 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On February 19, 1917, in the midst of World War I, a British ship, the SS Mantola, was torpedoed and sunk by a German U-boat in the North Atlantic. The ship and its cargo—including what is believed to be 536 bars of silver, each weighing 1,000 ounces and together worth several million dollars today—sat at the bottom of the ocean for a century. In 2011, Odyssey Marine Exploration, Inc. ("Odyssey"), an underwater exploration company, located the Mantola. It has since endeavored to bring the ship's cargo to the surface.

In April 2017, Odyssey brought this action *in rem*, invoking the Court's admiralty jurisdiction, against the Mantola and its cargo. Odyssey's complaint seeks to foreclose a maritime lien—a property interest explained below—that it claims against the Mantola for the services Odyssey performed in salvaging the wreck and its cargo. Odyssey has also asserted a claim for ownership over the vessel and its cargo.

At issue here is a motion by an alternative claimant. The United Kingdom Department for Transport ("DfT") entered this case as a claimant, asserting ownership over the Mantola. DfT now moves to dismiss Odyssey's claims against the Mantola. DfT argues that this Court lacks *in rem* jurisdiction over that portion of the wreck's cargo—some 526 of the 536 bars of silver—that it represents was removed from the wreck at an unspecified date in the past two years by an unspecified United Kingdom entity. Further, DfT argues, the removal of the vast majority of the wreck's valuable cargo makes the wreck no longer viable to salvage, such that Odyssey can no longer plausibly assert a claim for a salvage award, and thus cannot assert a maritime lien on the Mantola.

Separately, DfT contends that Odyssey has no right to disclosure of certain information relating to the circumstances under which the 526 bars of silver, take from the wreck, came to be deposited in the United Kingdom with the British government's Receiver of Wreck. DfT argues that disclosure of such information is prohibited by foreign law, and, in any event, is beyond the scope of the present litigation and thus irrelevant under Federal Rule of Civil Procedure 26(b)(1).

For the reasons that follow, the Court denies DfT's motion to dismiss and denies, without prejudice, Odyssey's request to compel discovery as unripe.

## I.    Background[1]

---

[1] The Court draws these facts principally from the Complaint, Dkt. 1 ("Compl."). The Court accepts as true all factual allegations in the Complaint, drawing all reasonable inferences in Odyssey's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

The Court also refers to the factual representations by counsel for DfT. Dkt. 42 ("Status Report"); Dkt. 49 ("Pl. Br."), Ex. A ("January 17, 2018 Letter"); *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter

### A. The Parties

Odyssey is an American company engaged in deep-ocean exploration, archaeological investigation, and the recovery of valuable cargo from shipwrecks around the world. Compl. ¶ 5.

On August 17, 2017, DfT entered the case as a claimant under Supplemental Rule for Admiralty and Marine Claims Restricted Appearance Rule E(8).[2] Dkt. 32. DfT claims ownership of the entirety of the vessel. *See* Compl. ¶ 9; *see also* Dkt. 32 ¶ 2.

### B. Initial Stage of Salvage of the Vessel (2011–2015)

In 1917, the SS Mantola, a United Kingdom-flagged 8,260 gross ton passenger steamship, sank during combat in World War I. Compl. ¶ 8.

In 2011, Odyssey located the Mantola in the North Atlantic Ocean, beyond the territorial jurisdiction of any sovereign nation, at a depth of approximately 2,500 meters. *Id.* ¶¶ 6, 7.

The Mantola is believed to have contained 536 silver bars when it sank. Odyssey alleges that, as of the date (April 21, 2017) its Complaint was filed, these remained aboard the vessel, on the ocean floor. *Id.* ¶ 9. In addition, the wreck site contains vessel remains, metal objects, cargo and other loose objects. *Id.* ¶ 17.

In 2011, DfT and Odyssey "entered into an agreement for the salvage of the cargo, which provided that Odyssey would retain 80% of the net value of the recovered silver." *Id.* ¶ 10.

---

jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."); *see also Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[W]hen, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise.").

[2] "Rule E(8) protects claimants in a *res* from subjecting themselves to general *in personam* liability beyond the value of the res." *Sea Hunters, LP v. S.S. PORT NICHOLSON*, No. 2:08-CV-272-GZS, 2013 WL 1789740, at *6 (D. Me. Apr. 26, 2013) (quotation omitted). DfT's restricted appearance pursuant to Rule E(8), however, "does not shield [its] interests in the defendant *res* from being adjudicated." *Id.* (quoting *Cobb Coin Co. v. The Unidentified, Wrecked & Abandoned Sailing Vessel*, 549 F. Supp. 540, 555 n.14 (S.D. Fla. 1982)).

Odyssey assumed the "risk, expense and responsibility" for the operation. *Id.* In September 2015, that agreement lapsed, and was not renewed. *Id.*

During this time, Odyssey recovered from the wreck a piece of silk cloth, *id.* ¶ 19, which it has turned over to this Court as the basis for *in rem* jurisdiction, and the ship's bell, which is currently at a conservation facility in the United Kingdom, *id.* ¶ 20.

### C. Subsequent Developments (2015–present)

Odyssey claims it has maintained "actual, continuous, and exclusive possession or constructive occupancy of the shipwreck site since it first located the Vessel to the extent this is possible" and since the expiration of the contract with DfT. *Id.* ¶ 15. Odyssey further maintains that it is the only company engaged in salvage operations on the vessel. *Id.* ¶¶ 12, 13.

Odyssey is in the process of developing a plan to continue the salvage operations of the vessel, to recover cargo and artifacts. *Id.* ¶¶ 16, 18. It claims that it is "ready and able" to recommence operations. *Id.* ¶ 14. Odyssey claims that it has invested substantial time, money and effort in its preparation for, and partial execution of, salvage operations thus far. *Id.* ¶ 23.

According to representations by counsel for DfT, in April 2017, at or around the time this action was commenced, 526 of the 536 bars of silver believed to be inside the wreck were salvaged—by an unnamed salvor—and delivered to a UK agency, the Receiver of Wreck. *See* Status Report; January 17, 2018 Letter.

### D. Procedural History

On April 21, 2017, Odyssey filed this action. Dkt. 1. On April 24, 2017, Odyssey moved, *ex parte*, for the issuance of an *in rem* warrant of arrest for the Mantola and its "cargo, apparel, tackle, and appurtenances, etc." Dkt. 5; *see* Dkts. 6–9.

On April 25, 2017, Odyssey moved for a preliminary injunction, seeking to enjoin any interference with the vessel by any other would-be salvor. Dkts. 11–13.

On May 1, 2017, the Court held an *ex parte* hearing on Odyssey's motions. At that hearing, Odyssey presented to the Court a silk cloth removed from the Mantola wreck. *See* Dkt. 23 (5/1/17 Tr.) at 13–14. Thereafter, the Court entered three orders relevant here:

First, the Court issued a warrant of arrest for the silk cloth. Dkt. 17; *see also* 5/1/17 Tr. at 14 (The Court: "You are under arrest."). That order effected an arrest of the portion of the Vessel brought into the district—*i.e.*, the silk cloth—and gave rise to the Court's "constructive possession of the Vessel itself, the site of the property, and everything that is a part thereof, wherever located and whenever removed there from, past, present or future and . . . any and all items that have or will be removed from the site of the defendant *res*, no matter who has brought up or who will bring up such items until a further determination of ownership is made or a further order of this Court is issued." Dkt. 17 at 3. The Court's order also authorized the U.S. Marshal to surrender possession of the arrested silk cloth to Odyssey, which the Court named as substitute custodian for the cloth. *Id.*

Second, the Court issued a preliminary injunction. Dkt. 18. That order enjoined any third party from interfering with Odyssey's "rights to salvage the shipwreck site." *Id.* at 2. The Court also ordered Odyssey to give public notice of its preliminary injunction by publication in *The New York Times*, *The Wall Street Journal*, and a shipping trade publication, *Lloyd's List*. *Id.*[3]

---

[3] On May 15, 2017, at Odyssey's request, *see* Dkt. 21, the Court authorized Odyssey to publish notice in *The Wall Street Journal*'s European Edition, rather than its U.S. edition, *see* Dkt. 22. Odyssey effected publication in each of the three newspapers in May 2017. *See* Dkt. 27.

Third, the Court granted Odyssey's request to seal the exact coordinates of the Vessel. Dkt. 19.

On August 17, 2017, following an extension of the deadline to file such a claim, *see* Dkts. 29–30, DfT submitted its claim of ownership to the Mantola, Dkt. 32. On September 7, 2017, DfT filed an answer to Odyssey's complaint. Dkt. 36.

On November 14, 2017, the Court held an initial pretrial conference in this case. Following that conference, the Court issued an order staying the case until February 15, 2018, to provide the parties an opportunity, through informal disclosures and correspondence, to resolve their dispute. Dkt. 41.

On February 15, 2018, the parties submitted a joint status update to the Court. Dkt. 42. In that letter, DfT represented that, in April 2017, 526 of the 536 bars of silver from the Vessel had been salvaged by a third party and transported to the United Kingdom. *Id.* at 1. DfT refused, however, to disclose (to the Court or to Odyssey) *who* had salvaged those silver bars. *Id.* at 2. Odyssey requested that the Court compel DfT to do so. DfT, in turn, requested that the Court dismiss the case.

On February 16, 2018, the Court set a briefing schedule for DfT's contemplated motion to dismiss. The Court also directed the parties to address Odyssey's contemplated motion to compel disclosure from DfT. *See* Dkt. 43.

On March 16, 2018, DfT moved to dismiss this case in its entirety. Dkt. 44; *see* Dkt. 45 ("DfT Br."). On April 5, 2018, Odyssey filed its brief in opposition. Dkt. 49 ("Pl. Br."). On April 20, 2018, DfT filed its reply. Dkt. 50 ("DfT Reply Br.").

## II.  Legal Standards

### A.  Motion to Dismiss[4]

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "Pursuant to Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is appropriate if the Court determines that it lacks the constitutional or statutory power to adjudicate the case." *Lleshi v. Kerry*, 127 F. Supp. 3d 196, 199 (S.D.N.Y. 2015); *see Makarova*, 201 F.3d at 113.

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 Fed. App'x 24, 27 (2d Cir. 2011) (citing *Makarova*, 201 F.3d at 113).  In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v.*

---

[4] The Court notes that DfT, although asserting the sovereign interests of the United Kingdom, has not moved to dismiss for lack of jurisdiction pursuant to the Foreign Sovereign Immunities Act.  *See* 28 U.S.C. § 1609.  The Court, therefore, does not address any such defense here.

Although DfT does not specify the basis for its motion to dismiss—whether for a failure to state a claim or otherwise—the Court construes DfT's motion as arising under Federal Rules of Procedure 12(b)(1) and 12(b)(6).  That is because DfT argues both that Odyssey's complaint fails to state a claim for a maritime lien (an argument sounding in Rule 12(b)(6)) and that this Court lacks *in rem* jurisdiction over the entirety of the *res* (an argument sounding in Rule 12(b)(1)).

*S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

### III. Discussion

DfT seeks dismissal of Odyssey's *in rem* complaint against the Mantola on one principal ground: that because nearly all of the Mantola's precious cargo has been removed, Odyssey does not have—and will never have—a maritime lien on the Mantola.

The Court begins with a brief explanation of the legal principles implicated by Odyssey's action and DfT's motion. The Court then addresses DfT's contention that intervening events—namely the purported salvage of 526 of the 536 of the Mantola's silver bars—require dismissal of this suit. Finally, finding dismissal unwarranted, the Court addresses Odyssey's motion to compel disclosure from DfT.

**A. Maritime Liens and Salvage Rights**

Article III of the Constitution extends the judicial power of federal courts to "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Since the 18th Century, Congress has implemented that grant of jurisdiction by conferring on district courts exclusive, original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction" and "[a]ny prize brought into the United States and all proceedings for the condemnation of property taken as prize." 28 U.S.C. § 1333. Federal courts have jurisdiction to the exclusion of the state courts over issues of maritime law "because of its intimate relation to navigation and to interstate and foreign commerce." *Panama R.R. Co. v. Johnson*, 264 U.S. 375, 386 (1924); *see also California v. Deep Sea Research, Inc.*, 523 U.S. 491, 501 (1998) ("The federal courts have had a unique role in admiralty cases since the birth of this Nation, because '[m]aritime commerce was . . . the jugular vein of the Thirteen States.'" (quoting F. Frankfurter & J. Landis, *The Business of the Supreme Court* 7 (1927)).

Courts sitting in admiralty apply a "*jus gentium* governing maritime affairs." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 960–61 (4th Cir. 1999) (explaining the 3,000-year-old history of international development of maritime law and the United States' adoption of that body of law). That is, Article III "authorized the federal courts to draw upon and to continue the development of the substantive, common law of admiralty when exercising admiralty jurisdiction." *Id.* at 960 (citing *The Lottawanna*, 88 U.S. (21 Wall) 558, 572–78 (1874)). *See generally The Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 544–45 (1828) (Marshall, C.J.) ("A case in admiralty does not, in fact, arise under the Constitution or laws of the United States. These cases are as old as navigation itself; and the law, admiralty and maritime, as it has existed for ages, is applied by our Courts to the cases as they arise.").

Federal courts exercise admiralty jurisdiction over matters arising from United States territorial waters, but also "from matters on the high seas anywhere in the world." *R.M.S. Titanic*, 171 F.3d at 961. However:

> Even though admiralty courts may adjudicate matters arising on navigable waters anywhere in the world, that recognition of subject matter jurisdiction does not imply that American courts in admiralty have the power to command that any person or any ship appear before a United States court sitting in admiralty. Stated differently, Article III of the Constitution and 28 U.S.C. § 1333 do not amount to an attempt by the United States to extend its sovereignty over persons (*in personam*) or things (*in rem*) beyond the territorial limits of the United States.

*Id.*

Although the Mantola sits several thousand feet below the surface of the North Atlantic and several thousand miles from this District, this Court nevertheless may exercise *in rem* jurisdiction over the Vessel. That is because, although an "*in rem* action . . . depends on the court's having jurisdiction over the *res*, the property which is named as defendant," "this possession may be actual or constructive." *R.M.S. Titanic*, 171 F.3d at 964; *see California*, 523 U.S. at 496 (noting district court's jurisdiction over a shipwreck based on actual possession over "china, a full bottle of champagne, and a brass spike from the ship's hull"). "Accordingly," although a court may only "exercise *in rem* jurisdiction over a ship or its cargo" where "the ship or cargo [is] within the district in which the *in rem* complaint is filed," *R.M.S. Titanic*, 171 F.3d at 964 (citing *The Brig Ann*, 13 U.S. (9 Cranch) 289, 291 (1815)), presentation of "only part of" the wreck is sufficient to allow a court to exercise "*in rem* jurisdiction over an entire ship wreck," *id.* Such constructive *in rem* jurisdiction "rests upon the fiction that the *res* is not divided and that therefore possession of some of it is constructively possession of all." *Id.*; *see California*, 523 U.S. at 496. That fiction is in effect here: As noted above, Odyssey, on May

1, 2017, presented to this Court a part of the wreck—silk cloth removed from the Mantola—over which the Court has exercised *in rem* jurisdiction.

This Court, exercising its admiralty jurisdiction, applies the general maritime law of salvage.[5] "In contrast to the common law, which does not grant a volunteer who preserves or saves the property of another any right to a reward, a salvor of imperiled property on navigable waters gains a right of compensation from the owner." 2 Thomas J. Schoenbaum, Admiralty & Mar. Law § 16-1 (5th ed.).[6] A plaintiff claiming an award for salvage must "demonstrate (1) that he has rendered aid to a distressed ship or its cargo in navigable waters; (2) that the service was voluntarily rendered without any preexisting obligation arising from contract or otherwise to the

---

[5] As an alternative to its claim for a salvage award discussed above, Odyssey has also brought a claim for ownership under the law of finds. Compl. ¶ 6. "The general maritime law of nations includes a law of finds and a law of salvage, and courts of admiralty apply one to the exclusion of the other, as appropriate, to resolve claims in property discovered and recovered in navigable waters by those other than the property's owners or those taking through them." *See R.M.S. Titanic*, 171 F.3d at 961. The Court finds the law of salvage—to the exclusion of the law of finds—applicable here. The law of finds is inappropriate because, as discussed above, the property at issue—the Mantola and its cargo—is clearly not abandoned. "To establish a claim under the law of finds, a finder must show (1) intent to reduce property to possession, (2) actual or constructive possession of the property, and (3) that the property is either unowned or abandoned." *See Odyssey Marine Expl., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 727 F. Supp. 2d 1341, 1344 (M.D. Fla. 2010) (citing *R.M.S. Titanic, Inc.* 435 F.3d at 532). In general, "[b]ecause the law of finds deprives the true owner of a property right, the courts of admiralty disfavor its application and prefer to apply the law of salvage in its stead," as the "law of salvage better serves the needs of maritime commerce by encouraging the saving of property for the benefit of its owner rather than the secretive discovery of property in an effort to deprive the owner of title." *R.M.S. Titanic, Inc.*, 171 F.3d at 961.

[6] *See generally Mason v. Blaireau*, 6 U.S. (2 Cranch) 240, 266 (1804) (Marshall, C.J.) ("If the property of an individual on land be exposed to the greatest peril, and be saved by the voluntary exertions of any person whatever; if valuable goods be rescued from a house in flames, at the imminent hazard of life by the salvor, no remuneration in the shape of salvage is allowed. The act is highly meritorious, and the service is as great as if rendered at sea. Yet the claim for salvage could not, perhaps, be supported. It is certainly not made. Let precisely the same service, at precisely the same hazard, be rendered at sea, and a very ample reward will be bestowed in the courts of justice.").

distressed ship or property; and (3) that the service was useful by effecting salvage of the ship or its cargo, in whole or in part." *R.M.S. Titanic*, 171 F.3d at 963; *see The Sabine,* 101 U.S. 384, 384 (1879).

"Upon rendering salvage service, a salvor obtains a lien"—a maritime lien— "in the saved property by operation of law to secure payment of compensation and award due from the property owner." *R.M.S. Titanic*, 171 F.3d at 963; s*ee The Sabine,* 101 U.S. at 386. "This lien attaches to the property to the exclusion of all others, including the property's true owner. And to facilitate enforcement of the lien, the salvor enjoys a possessory interest in the property until the salvor is compensated. Because the salvor's lien is exclusive and prior to all others, so too, the salvor's possessory interest in the *res* is enjoyed to the exclusion of all others, including the *res*' true owner." *R.M.S. Titanic*, 171 F.3d at 963; *see also* 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 9-1 (5th ed.).

"Although a salvor may enforce its claim for salvage service by filing an *in personam* action against the owner, the salvor may also execute on the lien which attached to the ship and its cargo by filing an *in rem* action." *R.M.S. Titanic*, 171 F.3d at 963. Odyssey's action here is the latter: an *in rem* action to execute on its lien. "The lien can be enforced only through the institution of an *in rem* action, and the admiralty court exercises *in rem* jurisdiction only to enforce a maritime lien. Thus, the lien and the proceeding *in rem* are . . . correlative—where one exists, the other can be taken, and not otherwise. To execute on the lien, the court may order the sale of the property, or, if a sale would yield an amount insufficient to fund an award to the salvor, the court may transfer title to the property to the salvor." *R.M.S. Titanic*, 171 F.3d at 963 (internal quotation, citations, and alterations omitted); *see also* Fed. R. Civ. P. Supp. R. C.

**B. DfT's Motion to Dismiss**

Applying those principles here, the Court concludes that DfT's motion to dismiss must be denied. DfT seeks dismissal of Odyssey's *in rem* action against the Mantola on the ground that, because most of the silver cargo has been removed from the Vessel, Odyssey does not have—and will never have—a maritime lien on the Vessel. DfT's argument straddles two interrelated issues: this Court's jurisdiction over the *res* and Odyssey's entitlement to a maritime lien over the *res*. Construed either way, however, DfT's argument falters.

###     1.    *In Rem* Jurisdiction

On May 1, 2017, this Court exercised jurisdiction over the entirety of the Mantola and its cargo. As explained above, that exercise of jurisdiction was—and is—based on the property brought into the District by Odyssey, a silk cloth salvaged from the vessel. *See* Dkts. 17 & 18; *see also* 5/1/17 Tr. at 17. Therefore, the Court has constructive *in rem* jurisdiction over the wreck and everything on it. Defendants concede that the Court has constructive *in rem* jurisdiction over the wreck site, DfT Reply Br. at 2, but claim that the Court never exercised jurisdiction over the 526 silver bars because they, assertedly, were removed from the site before the Court issued its injunction on May 1, 2017, *id.* at 5.

At this stage in the litigation, however, DfT's representations are insufficient to defeat this Court's jurisdiction. To be sure, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). "In opposition to such a motion," plaintiffs must "come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id.* (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976) (alteration in original)). "However, the plaintiffs are entitled to rely on the

allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show" jurisdiction. *Id.*

DfT's 12(b)(1) motion is unaccompanied by *any* evidence whatsoever. DfT has not attached any affidavit—from fact witnesses or even from counsel—to its motion. To the extent DfT's motion embeds factual representations tending to call the Court's jurisdiction into question, those representations are of scant value. DfT has not averred *who* salvaged the bars of silver, from where they were salvaged, or when they were recovered from the Mantola. *See* January 17, 2018 Letter. On the contrary, DfT refuses to disclose the name of the purported salvor; believes the date on which the bars were found—as represented to it by this anonymous salvor—is incorrect and accordingly represents that it has no "information on [the] actual recovery date"; and does not provide any basis for its conclusion that the bars were salvaged from the Mantola, rather than some other wrecked vessel. *See id.* at 2. Further, it appears from DfT's representations that the limited information it *does* have is secondhand: to the extent DfT represents that the 526 recovered bars of silver come from the Mantola, it is representing what an unknown salvor told an unknown official at the UK Receiver of Wreck. *See id.* Such representations are inadequate to support a fact-based Rule 12(b)(1) motion (as the Court— generously—construes DfT's motion).

### 2. Odyssey's Maritime Lien

Based again on the assertion that 526 of the 536 silver bars aboard the Mantola have been removed to the United Kingdom, DfT contends that Odyssey does not have, and will never have, a maritime lien on the Mantola because it has not performed, and realistically will never perform, any salvage services giving rise to such a lien. The Court agrees with Odyssey, however, that Odyssey's actions to date already give rise to a plausible claim for a salvage award, and thus a

plausible claim for a maritime lien. That the bulk of the Mantola's valuable cargo may have been removed may—depending on the circumstances—ultimately prove relevant to the value of the *res* on which Odyssey may have a lien. It does not, however, pretermit, at the pleading stage, Odyssey's claim.

As noted above, a plaintiff claiming an award for salvage "must demonstrate (1) that he has rendered aid to a distressed ship or its cargo in navigable waters; (2) that the service was voluntarily rendered without any preexisting obligation arising from contract or otherwise to the distressed ship or property; and (3) that the service was useful by effecting salvage of the ship or its cargo, in whole or in part." *R.M.S. Titanic*, 171 F.3d at 963. A salvor with a valid claim for salvage automatically acquires "a lien upon the property saved, which enables them to maintain a suit *in rem* against the ship or cargo, or both where both are saved in whole or in part." *The Sabine*, 101 U.S. at 386. This lien is a "limited possessory interest in the salved property," *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 532 (4th Cir. 2006), and comes "[u]pon rendering salvage service," *R.M.S. Titanic*, 171 F.3d at 963. The maritime lien usually entitles the salvor to recoup its expenses and an additional salvage award for the operation. *R.M.S. Titanic*, 171 F.3d at 963; *see also Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 525 F. Supp. 186, 207 (S.D. Fla. 1981). Complete success, however, is not required. *See Hener v. United States*, 525 F. Supp. 350, 357 (S.D.N.Y. 1981). "[A] would-be salvor who does not himself save the property involved will be paid for any service rendered that helps another salvor preserve the property." *Id.*

As pled, Odyssey has stated a valid claim for salvage—and thus for a maritime lien—under these standards. First, a shipwreck is an instance of maritime peril, clearly within the

bounds of a salvage award. *See, e.g., The Sabine*, 101 U.S. at 384 (maritime peril includes "actual peril or loss, as in cases of shipwreck, derelict, or recapture").

Second, on the facts pled, Odyssey has undertaken voluntary salvage operations. *See* Compl. ¶ 13; *see also The John Shaw*, 5 F. Cas. 1193, 1195 (C.C.D.N.H. 1859) ("Nothing short of a contract to pay a given sum for the service to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious salvage claim."). On the facts pled, Odyssey was "under no official or legal duty to render the assistance," rendering its actions voluntary. *LaPlante v. Sun Coast Marine Servs., Inc.*, 279 F. Supp. 2d 678, 688 (D.S.C. 2003). Indeed, DfT has not argued that Odyssey is ineligible for a salvage award due to lack of voluntariness.[7]

Third, Odyssey has successfully recovered a piece of silk cloth and the ship's bell from the wreck of the vessel. Compl. ¶¶ 19–20. Odyssey has also "engaged in extensive exploration, recovery and survey operations on the Vessel," and has "voluntarily and successfully obtained video and photographic images of the Vessel and has begun documentation of the site." Compl. ¶ 13; *see also R.M.S. Titanic, Inc.*, 171 F.3d at 963. Odyssey has thus rendered "useful" service to the Mantola. Even assuming, *arguendo*, that the 526 silver bars were legally removed from the vessel by the unidentified U.K. entity—and the undeveloped record in this case makes it impossible for the Court yet to so find—Odyssey's salvage efforts in the early stages of salvage may have made that extraction possible. *See* Compl. ¶ 13 (Odyssey has "engaged in extensive

---

[7] DfT does contend that the silk cloth was salvaged while Odyssey was under contract with DfT for the salvage operation of the Vessel. Def. Reply Br. at 3. DfT therefore argues that the cloth is Odyssey's property, and was no longer part of the Vessel and thus ineligible to be used as the *res* underlying this Court's jurisdiction. The Court, however, is not equipped at this stage to resolve this factual dispute, as DfT has not presented evidence substantiating its claim that Odyssey, pursuant to a contract, was ineligible to serve as a salvor. As this matter proceeds, the parties are at liberty to pursue this issue further.

exploration, recovery and survey operations on the Vessel"); *Nadle v. M/V Tequila*, 377 F. Supp. 414, 417 (S.D.N.Y. 1974) ("It is not required . . . that the property be saved solely by the efforts of the person seeking the award or that his efforts resulted in complete success. It is sufficient if his efforts contributed in some way to the ultimate success."); *Hener*, 525 F. Supp. at 357. Odyssey has thus plausibly pled facts sufficient to show, at the least, that it has salvaged the silk cloth and the bell. Beyond that, Odyssey's pleadings are consistent with the finding—as discovery may or may not establish—that its efforts meaningfully contributed to the salvage of the other material (*e.g.*, the 526 silver bars) from the wreck.

DfT's representation that 526 silver bars have been removed by another entity, assuming this claim is substantiated, may bear on the ultimate value of any salvage award to which Odyssey will be entitled and the property that may be available to satisfy Odyssey's lien. This litigation may establish that those 526 bars were removed from the wreck before this Court took jurisdiction, and thus that those bars are not part of the *res* over which Odyssey may have a maritime lien. Or, it may establish that Odyssey did not contribute to the salvage of those 526 bars. Or, it may establish that Odyssey's salvage of the vessel facilitated the retrieval of the 526 silver bars. Or, it may establish other facts altogether. Those questions are left for the merits. That the 526 bars of silver, under circumstances that remain elusive, may have been removed from the Mantola does not sink, at this early stage, Odyssey's claim for a salvage award or its entitlement to a lien on the Mantola.

For avoidance of doubt, this decision denying DfT's motion to dismiss does not resolve Odyssey's ultimate entitlement to a salvage award or a maritime lien. Nor does it resolve with finality this Court's jurisdiction, which the Court has an independent duty to ascertain throughout

the pendency of this litigation. In the event discovery yields evidence calling its jurisdiction into question, the Court will welcome a renewed motion to dismiss for lack of jurisdiction.

### C. Request to Compel Disclosure

The final issue presented involves discovery regarding the alleged salvage of the 526 bars of silver. Odyssey seeks to compel DfT to disclose information relating to the removal of the silver bars as proffered in the February joint status report submitted to the Court. *See* Status Report. There, DfT represented that "526 of the 536 bars of silver known to have been aboard the SS MANTOLA had been salvaged by another party and delivered to the UK Receiver of Wreck (RoW)." *Id.* Odyssey seeks information regarding the identity of this purported salvor. DfT resists this discovery request. It argues that this information is not relevant to the current proceeding. *See* DfT Br. at 8–9.[8]

This dispute is not yet ripe for this Court's review for the simple reason that discovery has not yet begun; the Court has not even entered a case management plan providing for fact discovery. The parties had proposed a plan that contemplated delaying all fact discovery until *after* Odyssey had completed salvage operations. *See* Dkt. 40-1. Declining to implement that plan, the Court instead stayed this case for 90 days to give the parties an opportunity to engage in informal discovery that might resolve the matter. *See* Dkt. 41. That process failed, *see* Status Report, and this motion resulted. With formal discovery having not yet commenced, the Court has not had occasion to resolve a hypothetical discovery dispute.

The Court does, however, offer this guidance. The Federal Rules of Civil Procedure allow

---

[8] Although DfT had previously suggested that foreign law barred disclosure of such information, in its reply brief, DfT disclaims such argument. DfT Reply Br. at 6.

> [p]arties [to] obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). It appears highly likely that the circumstances surrounding the removal of the 526 bars of silver from the Mantola—including who salvaged them; when such salvage began and concluded; whether the silver came, in fact, from the Mantola; and the connection, if any, between the removal of the silver and Odyssey's salvage efforts—will be integral to the claims of this case. Barring some as-yet unidentified basis for avoiding discovery as to these matters, the Court expects that discovery of DfT on these issues is likely to satisfy Rule 26's relevance requirement.

Accordingly, the parties are directed to submit, by one week from the issuance of this decision, a proposed case management plan for the remaining litigation of this case, which plan is specifically to include a plan for discovery. The parties are also to submit a joint letter, of no more than three single-spaced pages, setting forth their expectations as to how this case will now proceed.

## CONCLUSION

For the reasons given above, the Court denies DfT's motion to dismiss Odyssey's *in rem* complaint. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 44. As set forth above, the parties are directed to submit, one week from today, a case management plan and joint letter.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 8, 2018
        New York, New York