USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/19/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

ODYSSEY MARINE EXPLORATION, INC.,

                      Plaintiff,

            -v-

THE SHIPWRECKED AND ABANDONED SS
MANTOLA, its cargo, apparel, tackle, and
appurtenances, etc., located within a five nautical mile
radius of the coordinates 49º 50' 16.391" N, 13º 06'
11.767" W, *in rem*,

                    Defendant.

------------------------------------------------------------------- X

17 Civ. 2924 (PAE)

OPINION AND ORDER

PAUL A. ENGELMAYER, District Judge:

On September 12, 2019, plaintiff Odyssey Marine Exploration, Inc. ("Odyssey"), filed a motion seeking summary judgment against the SS Mantola—a British ship that was torpedoed and sunk by a German U-boat in the North Atlantic during World War I—and its cargo, which at one time included 536 silver bars. Dkts. 78, 83. Given the *in rem* nature of the case, there was no opposition to Odyssey's motion. Odyssey seeks a salvage award for certain items recovered from the Mantola, specifically, title to 526 silver bars and a silk cloth. For the following reasons, the Court grants Odyssey partial summary judgment, awarding it title to the silk cloth. The Court denies, without prejudice, Odyssey's motion for summary judgment to the extent it requests title to the silver bars.

## I.    Background[1]

On April 21, 2017, Odyssey filed this action.  Dkt. 1.  On April 24, 2017, Odyssey moved, *ex parte*, for an *in rem* warrant of arrest for the Mantola and its cargo.  Dkt. 5.  On April 25, 2017, Odyssey moved for a preliminary injunction to prevent any other salvors from interfering with the Mantola.  Dkts. 11–13.

On May 1, 2017, this Court ordered the arrest of a silk cloth recovered from the Mantola by Odyssey.  Dkt. 17.  This act gave the Court *in rem* jurisdiction over the Mantola and its cargo. *Id.*; 56.1 Statement ¶ 32.  That day, the Court issued a preliminary injunction, enjoining third parties from interfering with Odyssey's "rights to salvage the shipwreck site."  Dkt. 18 at 2.

On August 17, 2017, DfT made a limited appearance, pursuant to Federal Rule of Civil Procedure E(8), to claim property brought within the territorial jurisdiction of this Court.  It filed a verified statement of right or interest on behalf of DfT.  Dkt. 32.  The same day, DfT represented to Odyssey that, on a date unspecified, 526 of the 536 silver bars previously on board the Mantola had been removed by an unidentified third-party salvor and delivered to the United Kingdom's Receiver of Wreck ("RoW").  56.1 Statement ¶ 33.

In March 2018, DfT moved to dismiss, claiming that because almost all of the Mantola's cargo had been removed, Odyssey did not have a maritime lien on the ship.  Aug. 8, 2018 Op. at 8.  In opposing the motion, Odyssey attached a document it had been furnished by DfT, which conveyed that the salvor had represented that the "Date Found" for the silver bars was April 30,

---

[1] The Court draws these facts principally from Odyssey's Rule 56.1 Statement, Dkt. 87 ("56.1 Statement").  Here, the Court notes only the facts necessary to resolve this motion for summary judgment.  More detailed accounts are contained in the Court's August 8, 2018 Opinion on the United Kingdom Department for Transport's ("DfT") motion to dismiss, *see* Dkt. 51 ("Aug. 8, 2018 Op."), and July 10, 2019 Order granting Odyssey leave to file for summary judgment, *see* Dkt. 75 ("July 10, 2019 Order").

2017, *i.e.*, the day before the Court had asserted *in rem* jurisdiction over the Mantola. Dkt. 49, Ex. A at 2. DfT there stated that this "appears to be the date" that the bars entered the United Kingdom's jurisdiction. *Id.* DfT did not state that the bars had been removed from the Mantola on that date, stating instead that DfT did "not have any information on the actual recovery date." *Id.*

The Court denied the motion to dismiss, holding that it had properly exercised jurisdiction over the entirety of the Mantola and its cargo. Aug. 8, 2018 Op. at 13. In so doing, the Court noted that DfT's motion was "unaccompanied by *any* evidence whatsoever," including affidavits. *Id.* at 14 (emphasis in original).

After the Court issued its August 8, 2018 Opinion, DfT moved to withdraw from the case. Dkt. 52. On August 29, 2018, at a conference to address DfT's withdrawal request, DfT represented that RoW had been notified that the silver bars had been recovered on April 30, 2017, before this Court asserted jurisdiction. Dkt. 71 at 22. DfT stated that, as a result, Odyssey only had a maritime lien over the silk cloth, as to which DfT was withdrawing its claim. *Id.* at 32. The Court permitted DfT to withdraw. Dkt. 57.

Following DfT's withdrawal, Odyssey attempted to obtain discovery. On September 21, 2018, this Court issued Letters Rogatory seeking evidence from DfT and RoW. *See* Dkts. 58, 68. On December 19, 2018, the Queen's Bench Division High Court of Justice issued the requested orders and directed DfT and RoW representatives to produce documents and submit to depositions. Dkts. 73-1, 73-2. On March 25, 2019, however, the same court set aside the December 19, 2018 orders because they were "made without jurisdiction." Dkt. 74-1. Odyssey has not moved to set aside or vacate the March 25, 2019 orders, having concluded that "there is no basis for doing so under English law." 56.1 Statement ¶ 41.

Odyssey has attempted to further investigate when and by whom the bars were removed from the Mantola. To that end, on March 18, 2019, Odyssey submitted Freedom of Information Act ("FOIA") requests to DfT and RoW. 56.1 Statement ¶ 42. These requests were denied. *Id.* On April 23, 2019, Odyssey tried again, filing revised FOIA requests with both agencies. *Id.* ¶ 43. RoW then provided two redacted "Report of Wreck and Salvage forms," one of which was stamped "RECEIVED 05 MAY 2017" and the other of which was not dated. *Id.* ¶ 45; *see also* Dkt. 85 ("Kimball Dec."), Ex. E at 13–16. Both forms indicate that the property at issue was 526 silver bars; the shipwreck was the "SS Mantola"; and the "Date Found" was April 30, 2017. Kimball Dec., Ex. E at 13, 15. The RoW also provided a redacted e-mail dated May 3, 2019 that included pictures of the Mantola, *see id.* at 6, and pictures of the silver bars, *see id.* at 8–12.

In addition to making inquiries of these agencies, Odyssey also reviewed its own automatic identification system data. 56.1 Statement ¶ 47. Automatic identification systems are used on ships to send navigational data regarding a ship's whereabouts to other ships. *See id.* ¶ 47 n.3. Using this data, Odyssey determined that the silver bars were likely removed from the Mantola by the M/V SEABED CONSTRUCTOR sometime between April 21, 2017 and April 29, 2017; transferred to the M/V SEABED PRINCE in the English Channel on April 30, 2017; located in Scotland on May 2, 2017; and turned over to RoW on May 5, 2017. *Id.* ¶ 47.

On May 30, 2019, Odyssey moved for leave to file a motion for summary judgment, specifically, for a salvage award consisting of the 526 silver bars. Dkt. 74. On July 10, 2019, the Court granted Odyssey leave to so file. July 10, 2019 Order at 1. Anticipating potentially dispositive issues, the Court ordered Odyssey to address in its motion, *inter alia*, whether it had affirmative evidence that the bars were recovered *after* the Court exercised *in rem* jurisdiction

and whether the Court has *in rem* jurisdiction over the bars if they were, in fact, recovered before that date (*e.g.*, on April 30, 2017, as represented by DfT). *Id.* at 5.

## II.    Legal Standards Applicable to Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004); *see also Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). As a result, the court may deny an unopposed motion for several reasons. First, the motion will be denied if the movant fails to meet its burden of demonstrating that no genuine issues of material fact exist, "*even if no opposing evidentiary matter is presented.*" *Vt. Teddy Bear Co.*, 373 F.3d at 244 (emphasis in original) (quoting *Amaker*, 274 F.3d at 681). In evaluating whether the movant has met its burden, the court "may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement," but "must be satisfied that the citation to evidence in the record supports the

assertion." *Id.* Second, the motion will be denied if "the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (per curiam)).

In evaluating a motion for summary judgment, the court may choose to draw an adverse inference against parties who fail to produce requested evidence. *See Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 54 (S.D.N.Y. 2014) (noting that courts can issue adverse inference instructions for both spoliation and non-production of evidence). "District courts have 'broad discretion' in determining whether to grant an adverse inference." *Valenti v. Penn Mut. Life Ins. Co.*, 850 F. Supp. 2d 445, 452 (S.D.N.Y. 2012), *aff'd*, 511 F. App'x 57 (2d Cir. 2013) (citing *Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 776 (2d Cir. 2005)). A party requesting an adverse inference "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support that claim or defense." *Id.* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). To satisfy this test, the party seeking the adverse inference must show both that its opponent defied a court order or an obligation under the Federal Rules of Civil Procedure, *see Hawley*, 302 F.R.D. at 54, and that the evidence it has requested in fact exists, *see Valenti*, 850 F. Supp. 2d at 453.

**III.     Discussion**

Odyssey asks the Court to award it summary judgment, granting it a salvage award in the form of (1) title to the silk cloth, and (2) title to the 526 silver bars.[2]  Dkt. 86 ("Odyssey Mem.") at 3.  The Court addresses each in turn.

   **A.     The Silk Cloth**

Odyssey asks the Court to award it a salvage award that includes title to the silk cloth.  *Id.* at 3.  The Court grants Odyssey partial summary judgment, awarding it title to the silk cloth.

To establish a claim for a salvage award, a salvor must first show that he performed a "salvage service."  *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983).  A salvage service has "three specific elements: marine peril; service voluntarily rendered, not required by duty or contract; and success in whole or in part, with the services rendered having contributed to such success."  *Id.*; *see also R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 963 (4th Cir. 1999).  When a salvor renders a salvage service, he obtains a maritime lien in the saved property.  *R.M.S. Titanic*, 171 F.3d at 963.  This maritime lien allows a salvor to secure a salvage award.  *Id.*

Odyssey has met the requirements for a maritime lien—and thus a salvage award—as to the silk cloth.  First, Odyssey provided aid to an underwater shipwreck, which is an instance of a distressed ship in "marine peril."  *See The Sabine*, 101 U.S. 384, 384 (1879); *see also R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784, 794 (E.D. Va. 2010) (explaining that underwater Titanic "has faced, and continues to face, marine peril").  Specifically, its aid consisted of four series of voyages to salvage the Mantola.  56.1 Statement

---

[2] Odyssey also recovered 164 other artifacts from the Mantola.  *See* Odyssey Mem. at 19.  Odyssey does not ask for title to these artifacts as part of a salvage award, as it already has such title.  *See id.* at 19–20.

¶ 13.  Second, Odyssey voluntarily rendered aid to the Mantola, as it did not have "a legal duty or obligation" to conduct salvage operations.  *B.V. Bureau Wijsmuller*, 702 F.2d at 338.  Even if Odyssey was motivated by monetary gain to attempt salvage operations, that does not render its aid involuntary.  *Id.* at 339 ("[P]rofessional salvors—who perform their services for monetary gain—may claim salvage awards.").  Third, Odyssey's salvage attempt was successful in recovering the silk cloth.  Rule 56.1 Statement ¶ 28.

The Court may execute Odyssey's maritime lien to the silk cloth by ordering the sale of the silk cloth, or if such a sale "would yield an amount insufficient to fund an award" for Odyssey, by transferring title to the silk cloth to Odyssey.  *R.M.S. Titanic*, 171 F.3d at 963.  The decision to sell the property or award title lies within the Court's discretion.  *See R.M.S. Titanic*, 742 F. Supp. 2d at 808.  Odyssey has incurred over $3.4 million in expenses in its salvage operations—an amount that presumably would not be recouped in a sale of the silk cloth.  56.1 Statement ¶ 19.  The Court thus awards Odyssey title to the silk cloth.

### B.    The Silver Bars

Odyssey also asks the Court to hold, on its motion for summary judgment, that it is entitled to a salvage award consisting of title to the 526 silver bars.  Odyssey's motion raises the question of whether this Court has jurisdiction over the silver bars.

"An *in rem* action . . . depends on the court's having jurisdiction over the *res*, the property which is named as a defendant."  *R.M.S. Titanic*, 171 F.3d at 964.  If, however, the *res* is not within the court's jurisdiction, then the "court cannot make orders relating to or in aid of an *in rem* claim."  *Rolls Royce Indus. Power (India) v. M.V. Fratzis M. Stratilatis Navigation Ltd.*, 905 F. Supp. 106, 107 (S.D.N.Y. 1995).  Here, the Court, through its arrest of the silk cloth, gained *in rem* jurisdiction over the Mantola and its cargo as of May 1, 2017.  *See* 56.1 Statement

¶ 32. If, however, the 526 silver bars were not on the Mantola on May 1, 2017, then the Court is unable to assert its *in rem* jurisdiction over the bars—and unable to award title to such bars—as they would not have been part of the Mantola and its cargo at that time.

Odyssey does not assert that it has affirmative evidence that the bars were recovered from the Mantola after May 1, 2017. On the contrary, it states that it believes, although does not know, that the bars had been removed in the preceding 10 (or so) days. *See* Odyssey Mem. at 1 (stating that Odyssey believes the bars were removed between April 21 and April 29, 2017 and were turned over to RoW on May 5, 2017).

In urging that the Court, nevertheless, assert *in rem* jurisdiction over the bars, Odyssey makes two main arguments. First, it argues that, because DfT has not produced evidence as to when the bars were recovered, the Court should draw an adverse inference against DfT and the unknown salvor and assert its jurisdiction over the bars. *See* Odyssey Mem. at 8–9, 11. Second, Odyssey argues that its salvage lien dates back to 2012, and that the Court should exercise its equitable powers to protect this lien. *See id.* at 10. The Court is unpersuaded by each argument.

### 1. Adverse Inference

At the threshold, prior to considering a possible adverse inference, Odyssey, far from showing the absence of a genuine issue of material fact as to when the bars were taken from the Mantola, has failed to come forward with any affirmative evidence supporting its claim that the bars were seized on or after May 1, 2017. The evidence thus far adduced is to the contrary. In particular, the documents produced by RoW state that the bars' "Found Date" was April 30, 2017—before this Court asserted its *in rem* jurisdiction. *See* Kimball Dec., Ex. E at 13, 15. Odyssey has not pointed to any evidence even hinting that the silver bars were found at a later date or that, if found on April 30, 2017, they were removed from the Mantola on a date after this

Court asserted *in rem* jurisdiction. On the present record, had Odyssey had an adversary in this litigation who made a summary motion against Odyssey with respect to the silver bars, the Court might have been compelled to grant that motion on the grounds that jurisdiction must be proven affirmatively and there is no competent evidence that the Court ever had jurisdiction over the bars.

Odyssey instead urges that an adverse inference be drawn against the DfT and the unknown salvor. *See* Odyssey Mem. at 11. Odyssey notes that the form supplied by RoW to DfT and furnished to the Court by DfW leaves the critical date unstated. The form recites only that the unknown salvor *found* the bars on April 30, 2017, but it does not address the jurisdictionally critical issue of when the bars were actually *removed* from the Mantola. *See id.* Given DfT's silence as to the removal date, Odyssey encourages the Court to "draw an adverse inference against DfT and the unknown salvor" and find that it has jurisdiction over the bars, which were deposited with RoW on May 5, 2017, four days after this Court arrested the silk cloth.[3] *See id.*; *see also id.* at 8–9.

The Court declines to draw such an adverse inference, for two independent reasons. First, although the Court has "broad discretion" in exercising its ability to draw an adverse inference, Odyssey must first show that DfT disobeyed a court order in refusing to produce discovery. *See Valenti*, 850 F. Supp. 2d at 452. Here, no such order exists. DfT was not a party to this case. It appeared for a limited purpose and later withdrew, with permission. The Court,

---

[3] Of the dates of the events at issue, the date (May 5, 2017) on which the 526 silver bars were deposited with RoW is the only one as to which competent non-hearsay evidence exists, to wit, RoW's apparently official record that so certifies. As to the date (April 30, 2017) when the bars were purportedly found, the form supplied by RoW to DfT that so states is hearsay. It does no more than represent, secondhand, what RoW was purportedly told as to that date by the unknown salvor of the silver. As to the date when the bars were removed from the Mantola, no evidence, even secondhand, has been adduced.

during the August 29, 2018 conference held to discuss DfT's motion to withdraw, urged DfT and Odyssey informally to exchange information, and Odyssey and DfT did so. *See* Dkt. 69. This, however, was not a discovery order on which Odyssey can rely as the basis for an adverse inference. The failure of the Letters Rogatory that the Court issued to yield such information also does not supply a basis for an adverse inference. Although at one point the Queen's Bench Division of the English High Court had issued an order requiring DfT to produce documents and submit to depositions, Dkt. 73-2; 56.1 Statement ¶ 39, that tribunal later set aside that order for lack of jurisdiction, *see* Dkt. 74-1; 56.1 Statement ¶ 40. Odyssey, to date, has not moved to vacate that order, 56.1 Statement ¶ 41, or, apparently, revived its efforts in the United Kingdom to obtain discovery, including as to the identity of the salvor or the date when the silver bars were removed.

Second, even if DfT had disobeyed a discovery order, DfT is ultimately not the entity adverse to Odyssey as to ownership of the silver bars. That entity is the unknown salvor. The Court will not exercise its discretion to enter summary judgment on the issue of ownership on account of deficient discovery responses by a third-party entity. *See Stern v. Shammas*, No. 12 Civ. 5210 (NGG), 2015 WL 4530473, at *14 (E.D.N.Y. July 27, 2015) (explaining that "[a]n adverse inference instruction would be unfair where some third-party, rather than the defendants at trial, caused the erasure" of evidence and noting plaintiff's "fail[ure] to identify any case(s) where an adverse inference instruction was given at trial based on the actions of a . . . *non-party*") (emphasis in original)); *cf. Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 148 (S.D.N.Y. 2003) (drawing adverse inference based on non-production of evidence requires that "the party having control over the evidence had an obligation to produce it" (quoting *Residential Funding Corp.*, 306 F.3d at 107)).

Finally, even if the Court could draw an adverse inference against the unknown salvor based on DfT's failure to produce more records, the Court would not find this adverse inference sufficient to justify entry of summary judgment on the issue of ownership. As noted, literally no affirmative evidence has yet been adduced to the effect that the silver bars remained on the Mantola on the date this Court exercised *in rem* jurisdiction. And Odyssey itself has inferred, albeit without direct knowledge, that the bars were removed between April 21 and April 29, 2017. 56.1 Statement ¶ 47. Although an adverse inference can assist a party's case, the Court will not allow an adverse inference to be used here to fill a wholesale void as to a central element of Odyssey's case. *Cf. Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) ("[A]n adverse inference, without more, cannot satisfy a non-moving party's burden on summary judgment 'to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" (quoting *Celotex Corp.*, 477 U.S. at 323)). Such an adverse inference can only be used "at the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) (examining adverse inference in context of non-moving party attempting to survive summary judgment). As Odyssey has produced no affirmative evidence in support of its claim, this is not a case at the margin.

### 2.    Equitable Powers

Odyssey alternatively argues that the Court should treat Odyssey's maritime lien over the Mantola and its cargo as arising in 2012, when Odyssey first rendered services to the ship and recovered the silk cloth. Odyssey Mem. at 10. It asks the Court to find that it had constructive *in rem* jurisdiction dating back to 2012, *id.* at 1, and that "as a matter of equity," the Court should "enter appropriate orders to protect that lien from interference by third-parties," *id.* at 10.

The Court declines to do so.  The Court's *in rem* jurisdiction commenced on May 1, 2017, when it took custody of the silk cloth recovered from the Mantola.  No application was made earlier for the Court to assert such jurisdiction.  And the authority on which Odyssey relies in urging the Court, *nunc pro tunc*, to find that it had constructive jurisdiction two years earlier does not assist Odyssey's cause.  Odyssey points to Fourth Circuit cases stating that a salvor's lien attaches when the salvor performs a salvage service on saved property.  *See, e.g.*, *R.M.S. Titanic*, 171 F.3d at 963.  But the salvor's lien is distinct from the issue of jurisdiction, as *R.M.S. Titanic*, in fact, recognized.  The Fourth Circuit there noted that, to enforce the lien, a salvor must bring an *in rem* action, and for such an action to lie, the Court must have jurisdiction over the *res*, requiring it to possess the *res*.  *Id.* at 964.  To be sure, as *R.M.S. Titanic* recognized, the Court's possession can be either actual or constructive—meaning that the Court can "possess" the entire shipwreck when only part of the wreck has been presented to the Court.  *See id.*  But *R.M.S. Titanic* does not hold that a court may exercise jurisdiction before any part of the *res* is before the Court and before an *in rem* action has been initiated.  "[W]hen the *res* is not in the court's actual or constructive possession, traditional principles of *in rem* jurisdiction dictate that the court may not adjudicate rights to the *res* and effectively bind others who may have possession."  *Id.* (citing *Pennoyer v. Neff*, 95 U.S. 714, 724 (1877)).  The Court, therefore, declines to exercise its equitable powers to assert that its constructive possession, and, in turn, *in rem* jurisdiction, relates back to 2012.

## CONCLUSION

For the foregoing reasons, the Court grants Odyssey partial summary to award it title to the silk cloth, but the Court denies Odyssey's motion for summary judgment for a salvage award of title to the silver bars.

The Court's denial of Odyssey's motion as to the silver bars, however, is without prejudice, both as to this litigation and to Odyssey's right to pursue relief in a forum where jurisdiction is proper. As to this litigation, the Court recognizes Odyssey's legitimate interest in obtaining discovery as to the date on which the 526 silver bars were removed from the Mantola by the unknown salvor. Depending on the competent evidence adduced as to the removal date, a future motion for summary judgment might prove meritorious. Mindful of Odyssey's inability to date to secure such evidence from within the United Kingdom, the Court will permit Odyssey to move to reopen discovery. The Court directs Odyssey to file a motion to reopen discovery within four weeks, by December 17, 2019. Such a motion should identify concretely the discovery that Odyssey intends to undertake. In the event that Odyssey elects not to move to reopen discovery by that date, Odyssey is to submit a letter as to the future course of this case, including addressing, *inter alia*, whether the Court should dismiss, without prejudice, Odyssey's claims as to the silver bars for failure to establish jurisdiction over them. As to a potential action in another forum, *e.g.*, in the United Kingdom, the Court's decision does not in any way inhibit Odyssey from seeking to establish, in a court of competent jurisdiction, that its salvage efforts with respect to the Mantola that preceded recovery of the silver bars entitle it, under governing law, to some or all of those bars.

The Clerk of the Court is respectfully requested to terminate the motions pending at dockets 78 and 83.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: November 19, 2019
New York, New York